United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CHAD EMPEY,                          ) Case No. 11-00733 SC
                                     )
              Plaintiff,             ) ORDER GRANTING IN PART AND
                                     ) DENYING IN PART DEFENDANT'S
         v.                          ) MOTION FOR SUMMARY JUDGMENT
                                     )
ALLIED PROPERTY & CAUSALTY           )
INSURANCE COMPANY, and DOES 1 to     )
50, inclusive,                       )
                                     )
              Defendants.            )
                                     )

## I.   **INTRODUCTION**

Now before the Court is Defendant Allied Property and Casualty Insurance Company's ("Allied") motion for partial summary judgment regarding Plaintiff Chad Empey's ("Empey") second cause of action for breach of the implied covenant of good faith and fair dealing as well as Plaintiff's claim for punitive damages.  ECF No. 19 ("MSJ").  This motion is fully briefed.  ECF Nos. 65 ("Opp'n"), 112 ("Reply").  For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

///
///
///
///

**United States District Court**
For the Northern District of California

## II.   <u>BACKGROUND</u>[1]

### A.   <u>Empey's Policy Limits and Property Damage</u>

This case arises out of an insurance claim for property damage that Empey filed with Allied.  Empey is an experienced contractor, homebuilder, and glass artist, and owns a specialty glass shop. Kimura Decl.[2] Ex. 1 ("Empey Dep.") at 27-28, 30.  He also owns a home located at 12 Sundance Court in Petaluma, California, that was insured by Allied.  <u>Id.</u> at 33; Gonzalez Decl. Ex. 1 ("Policy"). The limits on the Policy were as follows: $648,700 for dwelling repairs; $480,038 for contents; and 12 months for "Additional Living Expenses" ("ALE").  Policy at 3345; Gonzalez Decl. ¶ 4.

On February 26, 2009, one of Empey's employees discovered that Empey's home had been broken into and extensively vandalized while Empey was out of town.  Empey Decl.[3] ¶¶ 2-3.  Unidentified

[1] Each party filed various objections to the other's evidence.  ECF Nos. 70, 113, 114.  Allied alone submitted over 40 pages of objections pertaining to a substantial portion of Empey's evidence, including evidence which has little relevance to the arguments before the Court.  This practice constitutes a violation of the page limits set forth in Civil Local Rule 7-2.  The Court declines to rule on these objections -- with a few exceptions -- because it does not rely on the purportedly objectionable evidence in reaching its decision.

[2] Declarations in support of the Motion were submitted by Rebecca K. Kimura ("Kimura"), Allied's attorney; David Bergamini ("Bergamini"), a General Manager at Mark Scott Construction, Inc.; Sandra Lankford ("Lankford"), a field claim specialist assigned to Empey's claim; and Tony Gonzalez ("Gonzalez"), a field consultant assigned to Empey's claim.  ECF Nos. 20 ("Kimura Decl."), 21 ("Bergamini Decl."), 22 ("Lankford Decl."), 23 ("Gonzalez Decl."), 40 ("Kimura Supp. Decl."), 115 ("Kimura Supp. Decl.").  At the request of the Court, Allied filed an index clarifying and correcting its citations to these declarations and their attached exhibits.  ECF No. 108 ("Defs.' Citation Index").

[3] Declarations in opposition to the Motion were submitted by Empey; Donald T. McMillan ("McMillan"), Empey's attorney; and Paul Hamilton ("Hamilton"), author of Empey's insurance claims handling expert's report.  ECF Nos. 66 ("McMillan Decl."), 67 ("Empey Decl."), 68 ("Hamilton Decl.").

1   person(s) stole numerous items of personal property, flooded the

2   house by opening faucets and breaking a sink, smashed and destroyed

3   expensive custom specialty glass surfaces installed throughout the

4   house, poured cement into the toilet, and used hammers to damage

5   every cabinet, wall, door, counter, and fixture.  Empey Decl. ¶ 3.

6        Empey notified Allied of the incident on the same day the

7   damage was discovered.  Empey Decl. ¶ 4.  On March 2, 2009,

8   Gonzalez, the primary adjuster on the claim, contacted Empey to

9   discuss his coverage.

10       **B.**   **Repair Estimates for the Property Damage**

11       Soon after Empey filed his dwelling claim (i.e., his claim for

12  property repairs), disputes arose concerning the cost to repair the

13  property.  Allied presented Empey with a preliminary repair

14  estimate of $32,000 on March 10, 2009 and a revised preliminary

15  estimate of $34,000 on May 8, 2009.  Gonzalez Decl. Ex. 7; Empey

16  Decl. Ex. 3.  Empey complains that both estimates were based on

17  work performed by Mark Scott Construction, Inc. ("MSC"), which gets

18  95 percent of its work from insurance companies and is one of

19  Allied's preferred vendors.  Opp'n at 2.  Empey also contends that

20  the estimates excluded a number of items, including marble

21  countertops, wood cabinets, replacement of matching tile throughout

22  his home, and carpeting, among other things.  Id. ¶ 7.  Based on

23  the May 2009 estimate, Allied made an advance payment to Empey of

24  $30,964.38.  Gonzalez Decl. ¶ 21.

25       Neither the March nor the May estimate included the cost to

26  replace Empey's specialty glass.  See Gonzalez Decl. ¶¶ 18, 20.

27  Gonzalez repeatedly contacted Empey about the pricing information

28  for the glass between April and December 2009, but Empey did not

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

provide the requested information until January 2010.  See id. ¶¶ 18, 20-30.  Empey declares that he started the process of finding a glass contractor in the spring of 2009 but was delayed because there are only a limited number of companies in the Bay Area capable of doing the type of work needed.  Empey Decl. ¶¶ 10, 12, 14.  Empey ultimately decided to create his own quote with the assistance of his father's company, Emp's Graphic Eye ("Emp's"), and received "final information" from Emp's in late summer 2009.  Id. ¶¶ 4, 10, 14.  Empey's subcontract bid for the specialty glass totaled $172,339.  Id. ¶ 15.

On January 6, 2010, Empey sent Allied an estimate for dwelling repairs put together by his own general contractor, Ireland, Robinson & Hadley ("IRH").  Gonzalez Decl. ¶ 30.  The IRH estimate totaled $559,995.40, and included Empey's $172,339 subcontract bid for glass work.  Gonzalez Decl. Ex. 23 ("IRH Estimate").[4]

On March 24, 2010, Empey, Gonzalez, McMillan (Empey's attorney), and representatives from MSC and IRH met for about an hour at Empey's home to discuss the differences between the MSC and IRH estimates.  Id. ¶ 35; Empey Decl. ¶ 18.  The parties' accounts of the meeting are different but not inconsistent.  Gonzalez claims that he agreed to add some items to Allied's scope of repair and verified that all damages had been addressed.  Gonzalez Decl. ¶ 35.  Empey claims that Gonzalez promised to get him a revised estimate from MSC within 7 to 10 days.  McMillan Decl. Ex. 2.

The revised MSC estimate was not sent to Empey until August 31, 2010, over five months after the March 24, 2010 meeting.  Empey

---

[4] Empey claims that he informed Gonzalez in October 2009 that the IRH quote would be in the $559,000 range.  Empey Decl. ¶ 16 Gonzalez allegedly responded:  "We have a problem."  Id.

**United States District Court**
For the Northern District of California

Decl. ¶¶ 19-20.  MSC's final written estimate for dwelling repairs was $297,859.63.  Empey Decl. Ex. 7 ("MSC Estimate").  The estimate contained a bid for specialty glass at a cost of $165,141, and excluded items left open such as the central vacuum system, solar system, HVAC unit, alarm system.  <u>Id.</u>  In an October 15, 2010 letter to Gonzalez, McMillan pointed out that there was a difference of $154,485 between the MSC and IRH estimates.[5] McMillan Ex. 6 (Oct. 15, 2010 McMillan Ltr.) at 2.

The largest divergence in the repair estimates was for "tile" replacement; MSC's bid was $1,123 and IRH's was $40,328.  <u>Id.</u> Empey claims that Allied only intended to replace the tile in the front entry hall of the house (where tile had been damaged by vandals), as opposed to replacing all of the tile in Empey's home. <u>Id.</u>  Empey insisted that the tile in every room in his house should be exactly the same, just as it had been prior to the vandalism. <u>Id.</u>  Allied takes issue with this characterization of the MSC bid. <u>See</u> Reply at 9.

Empey also claims that the MSC estimate omitted repairs necessary to return the sheetrock walls to their original "laser finish."  Opp'n at 16.  Empey insisted that this would require installation of 5/8 inch sheet rock and the application of three coats of "mud."  <u>Id.</u>  Empey claims MSC's estimate only called for 1/2 inch sheet rock and one coat of mud.  <u>Id.</u>; <u>see</u> McMillan Decl. Ex. 29 ("Bergamini Dep.") at 121-22.  Allied responds that the MSC estimate did call for 5/8 inch sheetrock and that there is no

---

[5] It is unclear how McMillan arrived at this figure as the MSC bid was $297,859.63 and the IRH bid was $559,995.40.  In any event, neither party disputes the accuracy of McMillan's math.

**United States District Court**
For the Northern District of California

1   evidence that Empey's walls ever had laser finish.  <u>See</u> MSJ at 11;

2   Gonzalez Decl. Ex. 40.

3        Between October 2010 and January 2011, the parties conferred

4   several more times about the differences between the MSC and IRH

5   estimates, but, evidently, they did not reach any resolution on the

6   issue.  <u>See</u> Gonzalez Decl. ¶¶ 47-50.  In January 2011, Allied and

7   MSC agreed that MSC would perform the work described in its bid for

8   the amount stated.  <u>Id.</u> at 49-50.

9        **C.   <u>Personal Contents Claim</u>**

10       Empey was also dissatisfied with Allied's handling of his

11  personal contents claim.  Soon after the property damage was

12  discovered, Allied arranged for ServiceMaster to remove damaged

13  items and pack-up and store cleanable items so as to protect them

14  from water-damage. Lankford Decl.[6] ¶ 9.  On March 2, 2009,

15  Gonzalez requested that, within 60 days, Empey complete and return

16  a sworn statement in proof of loss ("Proof of Loss") in connection

17  with his contents loss.  Gonzalez Decl. ¶¶ 5-6, Ex. 2.  Empey was

18  subsequently granted an extension of time to complete the form.

19  Lankford Decl. ¶ 12.  In March of 2009, before Empey submitted his

20  Proof of Loss, Allied made advance payments of $5,000 and $26,801

21  to Empey towards his contents loss.  <u>Id.</u> ¶¶ 9, 11.

22       On July 30, 2010, Empey provided Allied with his Proof of

23  Loss, claiming a total combined contents loss of $260,580.

24  Lankford Decl. Ex. 21 ("Proof of Loss").  Empey claims that his

25

_____

26  [6] Empey objects to the entire Lankford Declaration on the grounds
    that it is not based on Lankford's personal knowledge.  ECF No. 70
27  at 2.  The objection is overruled.  Lankford's declaration almost
    exclusively deals with Allied's handling of Empey's personal
28  contents claim.  Lankford clearly had personal knowledge of these
    facts as she was assigned to the claim and fully reviewed the claim
    file.  <u>See</u> Lankford Decl. ¶ 3.

6

1    Proof of Loss was delayed because Allied failed to provide an

2    inventory of the items collected from his house in a timely manner.

3    See Empey Decl. ¶¶ 21, 24-26.   Empey states that he attempted to

4    obtain a complete list in the spring of 2009, but he had technical

5    difficulties opening the electronic files sent by Allied.   Id. ¶

6    23.   The parties dispute exactly when Empey received or could have

7    received the list of inventory compiled by ServiceMaster in a

8    useable format.   Compare id. with Empey Decl. ¶ 24.

9        Allied determined that the Proof of Loss was incomplete since

10   it failed to include a number of requested items, such as dates of

11   ownerships and receipts.   Gonzalez Decl. ¶ 28.   On August 10, 2009,

12   Gonzalez informed Empey that he needed to provide additional

13   information and that his Proof of Loss would be held in abeyance

14   until the matter could be resolved.   Id. Ex. 23.   Empey provided

15   additional receipts on August 24, 2010, but explained that many

16   receipts were missing because they had been stored in a box which

17   ServiceMaster had either misplaced or thrown out.   Empey Decl. Ex.

18   11.   Allied and Empey exchanged a number of communications

19   concerning the contents claim in the subsequent months, during

20   which time each party accused the other of being non-responsive.

21   See Lankford Decl. ¶¶ 34-37; McMillan Exs. 16, 22, 17, 26, 33.

22       On March 16, 2011, Lissa Cooley ("Cooley") provided an

23   appraisal report for the replacement values of certain of Empey's

24   items.   Lankford Decl. ¶ 39.   Empey complains that Allied failed to

25   provide Cooley with information pertaining to replacement cost

26   quotes which had been included in his Proof of Loss.   McMillan Ex.

27

28

7

United States District Court
For the Northern District of California

1   26 ("Lankford Dep.") at 137-38.  It is unclear what impact these

2   documents would have had on Cooley's ultimate appraisal.[7]

3      Finally, on June 15, 2011, Lankford informed Empey that Allied

4   had completed an undisputed inventory for contents that were

5   damaged or stolen and provided him with a check for $95,835.80.

6   Lankford Decl. ¶ 40.

7      **D.**   **Additional Living Expenses ("ALE")**

8      Empey's Allied policy also provided coverage for twelve months

9   of ALE.  Policy at 3345.  ALE covers any "necessary increase in

10  living expenses incurred" so that a "household can maintain its

11  normal standard of living" when a covered loss renders a property

12  "not fit to live in."  Id. at 3353.  Gonzalez informed Empey of his

13  ALE coverage when he first spoke with him, only a few days after

14  the property damage was first discovered.  Gonzalez Decl. ¶ 6.

15  Gonzalez also sent Empey a letter explaining various aspects of his

16  ALE coverage -- the letter did not include any information on the

17  twelve month limit on ALE.  See Empey Decl. Ex. 12.  In the months

18  after the property damage, Empey rented temporary housing while his

19  property was being repaired.  Empey Decl. ¶ 32.

20     The parties dispute when Empey's ALE coverage expired.  Empey

21  complains that Allied did not notify him that there was a 12 month

22  limit to his ALE coverage until March 15, 2010, almost a year after

23  the property damage.  Empey Decl. ¶ 30.  Around this time, McMillan

24  informed Allied that it was estopped from terminating ALE coverage

25

26  [7] Empey also complains that the staffing turnover on his contents
    claim delayed the entire process.  Four contents adjusters were
27  assigned to the claim -- (1) Jennifer Schultz ("Schultz"), (2)
    Gonzalez, (3) Jill Rankin ("Rankin"), and (4) Lankford.  When
28  Lankford replaced Rankin on the claim in December 2010, she noted
    "I will have to start from scratch."  McMillan Ex. 22 at 1512.

**United States District Court**
For the Northern District of California

1  because it failed to provide Empey with written notice of the

2  applicable limits.  <u>See</u> Gonzalez Decl. ¶ 36.  Allied stated that it

3  disagreed, but approved a payment of $12,425 for 90 days of

4  additional ALE coverage, effectively extending the coverage to June

5  15, 2010.  <u>Id.</u> ¶¶ 37-38.  Empey later demanded ALE for the period

6  after June 15, 2010, but Allied refused.  <u>See</u> Gonzalez Decl. Ex.

7  39.

8      **E.   Empey's Lawsuit**

9      On January 20, 2011, Empey filed suit against Allied in

10  California Superior Court.  ECF No. 1 ("Not. of Removal") Ex. A

11  ("Compl.").  The Complaint alleged claims for (1) breach of

12  contract, (2) breach of the implied covenant of good faith and fair

13  dealing ("bad faith claim"), and (3) declaratory relief.  <u>Id.</u>  For

14  his second claim for bad faith, Empey sought general, special, and

15  punitive and exemplary damages.  <u>Id.</u> at 10.  Allied subsequently

16  removed to federal court on diversity grounds.  Not. of Removal. ¶

17  6.  Allied now moves for partial summary judgment on Empey's bad

18  faith claim as well as his claim for punitive damages.

19

20  **III. <u>LEGAL STANDARD</u>**

21      **A.   <u>Summary Judgment</u>**

22      Entry of summary judgment is proper "if the movant shows that

23  there is no genuine dispute as to any material fact and the movant

24  is entitled to judgment as a matter of law."  Fed. R. Civ. P.

25  56(a).  Summary judgment should be granted if the evidence would

26  require a directed verdict for the moving party.  <u>Anderson v.</u>

27  <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 251 (1986).  Thus, "Rule 56[]

28  mandates the entry of summary judgment . . . against a party who

United States District Court

For the Northern District of California

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  <u>Anderson</u>, 477 U.S. at 255.  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  <u>Id.</u> at 252.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).

  **B. <u>Bad Faith</u>**

  California law recognizes in every contract, including insurance policies, an implied covenant of good faith and fair dealing.  <u>Wilson v. 21st Century Ins. Co.</u>, 42 Cal. 4th 713, 720 (Cal. 2007).  In the insurance context, the implied covenant of good faith and fair dealing requires the insurer to refrain from injuring its insured's right to receive the benefits of the insurance agreement.  <u>Egan v. Mutual of Omaha Ins. Cos.</u>, 24 Cal. 3d 809, 818 (Cal. 1979).  In order to state a claim for bad faith, a plaintiff has the burden of showing that (1) the insurer withheld policy benefits, and (2) that the withholding was unreasonable and without proper cause.  <u>Love v. Fire Ins. Exch.</u>, 221 Cal. App. 3d 1136, 1151 (Cal. Ct. App. 1990).

United States District Court
For the Northern District of California

1    Under the "genuine dispute rule," "an insurer's denial or

2  delay in paying benefits only gives rise to tort damages if the

3  insured shows the denial or delay was unreasonable." Wilson, 42

4  Cal. 4th at 723.  Thus, denial or delay of benefits due to the

5  existence of a genuine dispute may give rise to liability for

6  breach of contract, but not bad faith.  Id.  "A genuine dispute

7  exists only where the insurer's position is maintained in good

8  faith and on reasonable grounds."  Id.  "The reasonableness of an

9  insurer's claims-handling conduct is ordinarily a question of

10 fact."  Amadeo v. Principal Mut. Life Ins. Co., 290 F.3d 1152, 1161

11 (9th Cir. 2002).  The genuine dispute rule only allows a district

12 court to grant summary judgement on bad faith claims where it is

13 undisputed that the basis for the insurer's decision was

14 reasonable.  Id.  "On the other hand, an insurer is not entitled to

15 judgment as a matter of law where, viewing the facts in the light

16 most favorable to the plaintiff, a jury could conclude that the

17 insurer acted unreasonably."  Id. at 1162.

18

19 **IV.  <u>DISCUSSION</u>**

20    Allied argues that it is entitled to summary judgment on

21 Empey's bad faith claim because any denial or delay in benefits was

22 due to a genuine dispute concerning Empey's coverage under the

23 Policy.  Allied contends that the undisputed facts show that it had

24 a reasonable basis for its decisions concerning Empey's coverage

25 for (1) repair costs, (2) ALE, and (3) loss of personal contents.

26 Allied also contends that there is no clear and convincing evidence

27 of malice, oppression, or fraud to support Empey's claim for

28 punitive damages.

**United States District Court**
For the Northern District of California

**A.   <u>Dwelling Claim</u>**

The Court finds that triable issues of fact exist as to whether Allied acted in bad faith in handling Empey's dwelling claim.   Allied ultimately adopted a repair estimate which was approximately $154,485 lower than the estimate prepared by Empey's general contractor.   <u>Compare</u> MSC Estimate <u>with</u> IRH Estimate.   At this stage, the Court cannot determine which of these estimates was right, let alone whether Allied had a reasonable basis for choosing the lower estimate.

Further, triable issues of fact exist as to whether all necessary and covered repairs were included in the lower estimate chosen by Allied.   For example, Empey contends that the lower estimate did not include the cost to replace all of the custom tile in his home.   <u>See</u> Oct. 15, 2010 McMillan Ltr.[8]   Allied disagrees. <u>See</u> Reply at 9.   Based on the evidence presented, the Court cannot determine who is right without making a credibility determination, which would be inappropriate on a motion for summary judgment.[9]   If these repairs were in fact excluded from Allied's estimate, it is unclear whether Allied had a reasonable basis for its decision.

---

[8] Allied objects to the October 15, 2010 McMillan letter based on Federal Rules of Evidence 401, 402, 602, and on "asserted privilege at deposition."   ECF No. 113 at 6.   The Court overrules these objections to the extent they apply to the portions of the letter concerning the contents of the MSC bid.

[9] Allied does not point to anything in the MSC estimate which indicates that the estimate called for the replacement of all of the tile in Empey's home.   Deposition testimony by Randy Seiz ("Seiz"), an MSC contractor, indicates that a document from August 21, 2009 included "a proposal to replace all of the tile in the house."   <u>See</u> Kimura Supp. Decl. Ex. A ("Seiz Dep.") at 136-137.   It is unclear whether Seiz was referring to the MSC proposal.   Even if he was, the Court lacks sufficient information to determine whether his interpretation of the proposal is correct.

**United States District Court**
For the Northern District of California

1    Triable issues of fact also exist as to whether Allied

2  unreasonably delayed processing the dwelling claim.  The undisputed

3  evidence suggests certain delays were due to Empey's failure to

4  provide Allied with requested information, such as information

5  pertaining to his custom glass works.  However, the Court declines

6  to find that the total amount of time Allied took to process the

7  claim was reasonable as a matter of law.  This is an issue for the

8  jury.

9    Accordingly, the Court DENIES Allied's motion for partial

10 summary judgment with respect to Empey's dwelling claim.

11    **B.    Personal Contents Claim**

12    The Court also finds that triable issues of fact exist with

13 respect to Empey's personal contents claim.  For example, it is

14 unclear from the record whether Allied's delay in processing

15 Empey's personal contents claim was reasonable.  Empey submitted

16 his sworn proof of loss statement to Allied on July 30, 2010, but

17 Allied did not provide Empey with a final payment for his contents

18 claim until nearly a year later.  Proof of Loss; Lankford Decl. ¶

19 40.  This delay was due in part to the complexity of Empey's claim

20 as well as Empey's failure to provide Allied with documentation of

21 his loss.  However, other factors may have also contributed.

22 Whether or not this delay was reasonable is ultimately a question

23 for the jury.  Further, the evidence suggests that Allied neglected

24 to provide the drafter of Empey's appraisal report with potentially

25 pertinent information that had been included in Empey's proof of

26 loss statement.  See Lankford Dep. at 137-38   There is a triable

27 issue of fact as to whether excluding such evidence from the

28 appraisal report was reasonable.

1    Accordingly, the Court DENIES Allied's motion for partial

2    summary judgment with respect to Empey's personal contents claim.

3    **C.   Additional Living Expenses ("ALE")**

4    Summary judgment is appropriate with respect to Empey's claim

5    for ALE because he received all that he was entitled to under his

6    Allied policy.   The undisputed facts show that Empey received

7    coverage for 15 months of ALE, see Gonzalez Decl. ¶¶ 37-38, even

8    though the Policy only provided coverage for 12 months, Policy at

9    3345.   Empey contends that he was entitled to more than 15 months

10   coverage under the California Administrative Code ("the

11   Administrative Code") because Allied failed to provide proper

12   notice of the twelve month cap on ALE.   See Opp'n at 19-20.   This

13   argument lacks merit.

14   The Administrative Code provides, in relevant part:   "Every

15   insurer shall disclose to a first party claimant or beneficiary all

16   benefits, coverage, time limits or other provisions of any

17   insurance policy issued by that insurer that may apply to the claim

18   presented by the claimant."   Cal. Code Regs. tit. 10 § 2695.4(a).

19   The Administrative Code further provides "every insurer shall

20   provide written notice of any statute of limitation or other time

21   period requirement upon which the insurer may rely to deny a claim.

22   . . .   not less than sixty (60) days prior to the expiration date."

23   Id. § 2695.7(f).   Here, Empey admits that he was notified of the 12

24   month ALE time limit in a telephone conversation on March 15, 2010

25   and by letter dated April 14, 2010.   Opp'n at 19-20.   Empey also

26   admits that the April 14, 2010 letter notified him that his

27   coverage had been extended to June 15, 2010.   Id. at 20.   Thus, in

28   accordance with the Code, Allied notified Empey of the time limits

United States District Court
For the Northern District of California

14

**United States District Court**
For the Northern District of California

1   for his ALE over 60 days prior to their expiration.  Empey appears
2   to argue that Allied was precluded from ever terminating his ALE
3   benefits because it purportedly failed to notify him of the time
4   limits "at the inception of his loss."  <u>See</u> Opp'n at 19-20.
5   However, the Administrative Code does not impose such a requirement
6   and Empey cites no other authority to support his position.

7       For these reasons, the Court GRANTS Allied's motion for
8   partial summary judgment with respect to Empey's claim that his ALE
9   claim was handled in bad faith.

10      **D.   <u>Punitive Damages</u>**

11      Allied also argues that Empey's claim for punitive damages
12  fails because (1) Empey has presented no evidence of malice,
13  oppression, or fraud; and (2) no officer, director, or managing
14  agent of Allied ratified any malicious, oppressive, or fraudulent
15  conduct.  The Court agrees.  The standard for establishing
16  liability for punitive damages is much higher than the standard for
17  bad faith.  Empey has not come remotely close to meeting his burden
18  with respect to punitive damages.

19      The California Civil Code provides that a plaintiff is
20  entitled to punitive damages "where it is proven by clear and
21  convincing evidence that the defendant has been guilty of
22  oppression, fraud, or malice."  Cal. Civ. Code § 3294(a).  Malice
23  is defined as "conduct which is intended by the defendant to cause
24  injury to the plaintiff or despicable conduct which is carried on
25  by the defendant with a willful and conscious disregard of the
26  rights or safety of others."  <u>Id.</u> § 3294(c)(1).  "'Oppression'
27  means despicable conduct that subjects a person to cruel and unjust
28  hardship in conscious disregard of that person's rights."  <u>Id.</u> §

**United States District Court**
For the Northern District of California

1   3294(c)(2).  Summary judgment on the issue of punitive damage is

2   only proper "when no reasonable jury could find the plaintiff's

3   evidence to be clear and convincing proof of malice, fraud, or

4   oppression."  <u>Hoch v. Allied-Signal, Inc.</u>, 24 Cal. App. 4th 48, 60-

5   61 (Cal. App. Ct. 1994).

6      In the instant action, no reasonable jury could find by clear

7   and convincing evidence that Allied is guilty of despicable conduct

8   or oppression, fraud, or malice.  The undisputed evidence shows

9   that Allied: responded to Empey's claim almost immediately; agreed

10   to pay for almost $300,000 in dwelling repairs; paid out over

11   $100,000 on Empey's personal contents claim; made a number of

12   advance payments to Empey before he had submitted information

13   required to verify his claim; and granted Empey an additional 90

14   days of ALE coverage.  Allied asserts, and Empey does not dispute,

15   that Allied has paid Empey a total of $576,160.29 for his vandalism

16   claim.  The current value of Empey's home is only $402,000.  While

17   there were delays in the processing of Empey's claims, they were

18   due in large part to Empey's failure to provide requested

19   information.  In light of these facts, Empey's failure to produce

20   any direct evidence establishing fraud, malice, or oppression, and

21   the high standard for establishing punitive damages, Empey's claim

22   for punitive damages must fail.

23      The California Civil Code also provides that a corporate

24   entity, such as Allied, may not be held liable for punitive damages

25   unless an officer, director, or managing agent[10] of the corporation

26   authorizes or ratifies an act of oppression, fraud, or malice.

27   Cal. Civ. Code § 3294(b).  Empey argues that Gonzalez's decisions

28

---

[10] A managing agent is an employee with "broad discretion" who
"determines corporate policy."  <u>Egan</u>, 24 Cal. 3d at 822-23.

United States District Court
For the Northern District of California

1  regarding his dwelling claim were ratified by Teresa Mitchell

2  ("Mitchell"), Property Claims Director, and Chad Zierke ("Zierke"),

3  Assistant Vice President.  Opp'n at 14.  This argument is

4  unpersuasive.  According to the evidence offered by Empey, Mitchell

5  and Zierke's involvement with the dwelling claim was almost

6  exclusively limited to authorizing an increase in the amount Empey

7  could potentially recover for his claim.  See McMillan Exs. 14 at

8  18-20, 24 at 49.  Mitchell testified that her job responsibilities

9  include periodically reviewing files and ensuring claims managers

10  follow procedures, but there is no evidence that she had any

11  knowledge of wrongdoing in connection with Empey's claim.  See id.

12  Ex. 24 at 49.  Empey's claim that Mitchell and Zierke somehow

13  ratified or authorized oppression, fraud, or malice by increasing

14  the reserve on his account strains credulity.[11]

15      Accordingly, the Court GRANTS Allied's motion for partial

16  summary judgment with respect to Empey's claim for punitive

17  damages.

18

19  **V.   CONCLUSION**

20      For the foregoing reasons, the Court GRANTS in part and DENIES

21  in part Defendant Allied Property & Insurance Company's motion for

22  partial summary judgment.  The Court DISMISSES Plaintiff Chad

23  Empey's claim for breach of the implied covenant of good faith and

24  fair dealing as it applies to Empey's insurance claim for

25  Additional Living Expenses.  The Court also DISMISSES Empey's claim

26

27  _____

[11] Empey also contends that Mitchell was aware of disputes
concerning his ALE claim.  Opp'n at 24.  However, as discussed in
28  Section IV.C supra, there is no evidence that Allied engaged in bad
faith, let alone fraud, malice, or oppression, in connection with
this claim.

for punitive damages.  Empey's other claims for relief remain
undisturbed.

        IT IS SO ORDERED, ADJUDGED, AND DECREED.


        Dated: January 12, 2012
                                    _____
                                    UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California